Call in case 15-4043, Patti Okuno v. Reliance Standard Life Insurance Company. Oral argument not to exceed 15 minutes per side. Tony, Mary for the appellant. Thank you. Good morning, Your Honor. May it please the Court, I'd like to reserve three minutes. All right. This Court has often suggested that one of the measures of the reasonableness of a decision of a planned administrator depends upon the quality and quantity of the evidence in the record. With respect to the quality and the quantity of the evidence in this case, the various opinions of Dr. Dan Jones, Patti Okuno's treating neurologist, establish beyond reasonable question that Patti's disabled by narcolepsy and Sjogren's disease. Dr. Jones's opinion is supported by objective testing in the form of a baseline polysomnography and a multiple sleep latency test, as well as by Dr. Jones's clinical observations. At the time he wrote his last opinion, he'd been treating Patti for 12 or 18 months. Not only did Dr. Jones provide a diagnosis supported by objective evidence, he specifically explained how these diseases disabled her. In the record we have a couple of documents that he submitted in support of her social security disability claim where he explained that based upon Patti's medical condition, she would have difficulty understanding, remembering, and carrying out simple instructions. She would not be able to perform work at a consistent pace. He said that she'd have good days and bad days, but that he said that she would miss work more than four days in any given month. And the four days was the maximum number that he could check. They didn't have five or six. Reliance, both in their administrative review and in their briefing in this case, ignored Dr. Jones pretty much completely. There's no reference at all to objective tests. There's no real reference to his opinions. Reliance instead relied exclusively on Dr. Koretsky's report. We've cataloged in our brief all the problems with Dr. Koretsky's report, not least of which are his qualifications. He's a pulmonologist. I understand that they suggested in footnotes that he runs a sleep clinic. That may or may not be the case. Or ran one. Or ran one. Many years ago. Okay. That could be. All my point was is I could probably run a sleep clinic as long as I had qualified sleep doctors to work there. I don't think that establishes that he's qualified. His board certifications don't refer to sleep medicine at all. And I think it's also important to note that he wrote two opinions. In his first opinion, he never really said that he didn't think Patty had narcolepsy. He has two or three paragraphs where he kind of dances around the narcolepsy issue and says, well, this seems to me to be unusual, and this seems to me to be unusual. But he never says that she doesn't have it. He never disagrees with the diagnosis. And furthermore, he was asked whether he would make any recommendations for changes in her treatment. And other than he said he thought she needed to see a psychiatrist, he didn't make any other suggestions. And most of her treatment was directed toward the fact that she's a narcoleptic. So that's inconsistent. But there's nothing to indicate that their paper reviewer ever contacted Ms. Acuno's doctors. Is that correct? Correct, correct. There's nothing in the record at all that indicates that anybody talked to Dr. Jones. In fact, Dr. Jones was obviously frustrated because after Dr. Koretsky issued his opinion, Dr. Koretsky wrote a rebuttal. It's in the record. I'm sorry. Dr. Jones wrote a rebuttal. Dr. Jones was clearly miffed that he's practically screaming and nobody is listening. So, no, you're correct. There's nothing in the record that indicates anybody ever spoke to him or tried to. Particularly also about kind of the understated conclusion that she didn't have Crohn's disease and there was some sort of infection. That was Dr. Koretsky also. How does that fit in this argument? Part of the problem with them figuring out what was wrong with Patty, because she showed up at her doctor's office on a Monday in January complaining of things that ultimately proved to be narcolepsy related. And then a week later she went into the hospital with severe abdominal problems. And I think basically they decided that she had two different disease processes going on along the way. Crohn's. Dr. Koretsky said Crohn's and Dr. Jones said narcolepsy and Sjogren's. And, you know, once again, Dr. I said Dr. Koretsky again. I'm sorry. It was Dr. Pelfrey. Is that the sports medicine doctor? No, Dr. Perillo is the boxing doctor. Dr. Perillo. They had two reviewers. Perillo reviewed initially, and he's a sports medicine guy. And I think his qualifications rule him out for any reasonableness in the opinion. But the other thing is he did not, at the time he made his opinions, have Dr. Jones' last information and the multiple sleep latency test. So I didn't dwell a lot on Dr. Perillo. Dr. Pelfrey is Patty's personal care physician. He's the one that diagnosed Crohn's. And, you know, once again, Koretsky said, yeah, it's not Crohn's, but I don't know how you can say that on a paper review. I mean, they're putting a lot of weight on Dr. Koretsky here. And the other problem with Dr. Koretsky is after he wrote his first opinion that was kind of ambiguous about whether he thought Patty was disabled and, if so, why, they asked him for a correction. And he said, well, she's mentally disabled, but she can physically work at a full-time sedentary job, and that's just out of the blue. I mean, there's no evidence that he could have reached that conclusion. That's like I had a case here years and years ago, the McDonald case that gets cited every now and then. And they did the same thing there. They got an opinion from a guy that was kind of ambiguous, so they called him and asked him if he could write it, and the second opinion was, yeah, there's nothing wrong with this guy. He could work. And this court assailed that opinion for the second opinion for it didn't have any basis in it, and I think it really makes his whole opinion suspect. I want to turn to this argument by the company that she only gets 12 months disability payments if her mental condition contributed to her disability, even if there are physical impairments. Thank you, Your Honor. I was just going to say I want to turn to that before I run out of time. I think it's pretty clear from their letters, not clear necessarily from their argument in their brief, but I think it's pretty clear from their letters that they said depression shows up in the medical records, therefore this provision applies and we can limit her benefits to one year. I've been doing this for 25 years. I've never had a disabled client who wasn't depressed. You're fighting the insurance company. You can't work. You don't feel good. Your family wonders why you're not working. So you can find depression in any medical record, so it's important, I think, to clarify. And I also think that Ms. Bischoff, who is the only mental health professional in the record, her observation that Patty's mental problems were sprang from her physical problems, plus the evidence that a lot of people with narcolepsy have depression, I think that carries the day for us on the mental illness. We've asked the court to consider adopting the DSM-IV etiology-based recognition and it applies to fibromyalgia, it applies to brain injury. Sometimes depression is just part of the physical disease. Even aside from that, the second test that Reliance now concedes applies is the test from the George case where if the evidence is clear that a person is physically disabled, you don't look at the mental part. The mental illness thing doesn't apply. To return just for a second to the DSM-IV argument, if you look at the definition in the Reliance policy of mental or nervous disorders, and it's on page 5 of my opening brief, it's on 13-1, PI number 94 of the record, it lists nine, well, it really lists eight because the ninth is mental illness and so that's kind of redundant, but it lists things like bipolar disorders, schizophrenia, delusional paranoid disorders, psychotic disorders. Those things are all primary mental disorders. I really think that's what this policy was getting at. It does say depressive disorders, but that's pretty broad. So I think a fair interpretation of this limitation is that when the ideology of the depression is the physical disease, you can't apply the mental illness limitation. What's interesting is to think that they have written these policies so that if you have a lifelong mental disability like bipolar or schizophrenia, you're not going to be able to get long-term disability benefits. Yeah, and when Congress was considering the Mental Health Parity Act, I was really hoping that they would address that particular problem because it's just tragic. What's our standard of review here? We are to review de novo the administrative record without having to give deference to the district court's opinion. Then we have this arbitrary and capricious standard to be applied if reliance had discretion in determining eligibility for benefits. What's your take on what our standard is? I think the arbitrary and capricious standard applies. I think you don't have to give any deference. I mean, it's clear you don't have to. This is a fresh look. The district court's not entitled to any deference. The odd thing in this case is with respect to the mental illness limitation, and that's really the principal part of the dispute, is reliance has the burden of proof. I've looked for cases that talk about how you reconcile a burden of proof issue to where you've got deferential review, and I think one of the main differences is they can't win with substantial evidence. They have to win with a preponderance. I think that's a key difference. If their selection of the evidence is reasonable, which it is not in this case, I think it can defer to that. I think had they interpreted their policy reasonable, I think you would defer to that. But they've still got the burden to prove not by substantial but by a preponderance. My time is up. All right. Thank you, Your Honor. Thank you, Your Honor. Morning. Good morning, Your Honors. May it please the court. You can turn the light on, please. Turn the light on, please. The green light. On the podium? Yeah. Sorry. Yes. Thank you. Good morning again. Good morning. Edna Gersting for the defendant. I believe Reliance Standard Life Insurance Company in this matter today. We need to briefly address the standard of review. That was one of the issues Your Honors had raised, which is an arbitrary and capricious standard of review. I agree with Mr. Mary that the district court does not deserve deference, but my client does, which means that as long as my client's determination is supported by reasonable evidence, my client's determination has to be upheld. I'm concerned about the posture in which this case comes to us. It seems to me that the frame is rather odd because in the district court, you argued and the district court accepted the argument that if a mental illness contributes to a disability, then you get no disability coverage. That is not true. That's not what I argued, Your Honor. Well, that's what my understanding of the briefs, and I think there's no question that the district court held that, if the mental health issue contributes to the disability, then you do not qualify for disability. But my understanding is before this court, your argument now is in accord with George. My argument has always been the same thing. Well, perhaps you disagree. Sure. The benefits for a mental or nervous condition, whether it causes or contributes to the disability, are only 12 months per the policy. Well, now that's, you're back saying what I thought you said. If the mental health contributes to the disability, you only get 12 months. Or the mental condition. So the question before us is whether there is sufficient independent evidence of a physical disability for which she qualifies. Which is what my client determined, which is what we've argued from the get-go, which is what Judge Frost looked at as well. The question whether she is solely disabled from a physical standpoint. That's the issue here before this court. That's the issue. So help me, since the analysis in your denial letters had to do with a determination that there was a mental health issue and that she received the 12 months of mental coverage. It's one part of the determination. That's one part. Point me to the best analysis that you have in your denial letters of her symptoms relating to Crohn's, narcolepsy, fibromuscular dysplasia, Sogren's. I was at several different letters as a result of the late approval of benefits. The issue was that Ms. Okuno's appeals were exhausted on the physical issue at a point where the benefits for the mental condition were approved. So the findings... So in what letter would you say contains the analysis of her physical ills? It should be the letter after the first appeal, I believe. There were three appeals here. And I believe the result of the second appeal was the split decision that benefits were to be awarded for depression and anxiety, which are specifically referenced in the policy as mental conditions that benefits are to be awarded for if they contribute or cause. And it still maintains that the physical conditions themselves, which is the same that Reliance Standard said earlier, by themselves were not disabling. And the physical conditions in this case fall into two camps. We have fibromyalgia and spinal and cervical issues, which cause pain. Those conditions are all preexisting. The initial claim in this case was... The fibromyalgia, I think nobody disputes that the fibromyalgia is a preexisting. I guess then we should concentrate on Crohn's, narcolepsy, fibromuscular dysplasia, and Sogren's. I think, yes, I disagree with regard to the fibromuscular dysplasia. I think that is off the table. And there was a footnote in Plano's appellate brief which suggested that that was a prior working diagnosis. But towards the end, her own treating physicians realized that that was not a proper diagnosis in this case. So we're looking at narcolepsy. That's absolutely correct. We're looking at a possibility of Crohn's. There's a split of opinion. Well, her treating physician has diagnosed and treated Crohn's, correct? There are some records that suggest that, yes. But some others don't. There is a myriad of medical evidence here, Your Honor. And there's a lot of inconsistency. Can you point me to somewhere in her medical records where her own doctor says she does not have Crohn's disease and he's not treating her for it? Which doctor? Well, we've got Jones and Pelfrey. Jones does not address Crohn's disease at all. Dr. Pelfrey, her family doctor, says she's disabled as a result of all kinds of conditions, including fibromyalgia, including depression, including anxiety. Somebody's treating her for Crohn's disease because she's receiving medication for it and is at some point in the hospital complaining of symptoms of Crohn's. That might be. Well, doesn't that establish that she has Crohn's? Crohn's isn't something that clears up on its own. I understand. But Mr. Mary didn't mention Crohn's in his own oral argument, actually. He addressed the court saying disability was based on narcolepsy and Sjogren's, which is something. Well, Sjogren's is a condition similar to Crohn's, is it not? It's an autoimmune disorder, yes. Okay. But similar, I think it affects a different part of the body. But irrespective of whether she does or doesn't have it, I mean, the result is always the same. The medical records, while they provide evidence that diagnoses have been made, including narcolepsy, what they do not provide is objective evidence how those conditions affect her ability to work, minus depression, anxiety, fibromyalgia, and spinal disorders. And that is exactly the issue here. And that is exactly what my client examined and evaluated during this case, whether the physical conditions that are left after we subtract the preexisting conditions and after we subtract the mental conditions, whether those conditions by themselves, standing alone, reach a level. And the test that your opposing counsel referred to in his argument and in his briefing, it's your position that those are not independent evaluations, not workups that establish her inability to work? There is nothing in the record that establishes her inability to work on an objective basis. Yes, we have Dr. Jones' opinion that she is limited and can concentrate more than two hours, but we don't have any neuropsychological evaluation which says that there are indeed cognitive impairments here, objectively, other than just Dr. Jones. Are we talking about cognitive impairments or are we talking about physical impairments related to autoimmune disease? Because if you're trying to divide between mental and physical, that was your opportunity to have employed for the review of the records a mental health specialist, and you chose not to do that. It's not our burden, Your Honor. It is plain of Spartan to objectively prove that her medical conditions reach such a severity as to prevent her from performing the material and substantial duties of initially her regular occupation and thereafter any occupation. She submitted a claim based on two conditions. We examined those conditions, and we found that those conditions were preexisting. She shifted course and told us, oh, hold on, those are not the conditions I'm disabled for. I'm actually disabled based on those conditions. At that point, the first time she mentioned narcolepsy, Sjogren's, and Crohn's disease. My client reviewed those conditions, and while Mr. Mary keeps on saying that Mr. Perillo is a sports medical physician, that's not true. He's an occupational specialist. He is specialized in occupational medicine. He's actually the type of physician that is appropriate for a case like this, which means a physician who reviews limitations and restrictions as a result of medical conditions and how they affect a person's ability to work. That's the question here, and that's what he did. He rendered an opinion that fibromyalgia and the spinal disorders are preexisting and that the remaining physical conditions were not disabling. Given how many serious and rather complicated medical conditions the plaintiff was claiming and the difficulty of determining when these arose and how the mental, emotional conditions related to her physical disabilities and all like that it's sort of troubling that the company didn't see fit to have her actually examined and only had physicians to look at her, review her medical records. And I know I'm asking a compound question here, but it's also a bit troubling because some of the physicians that examined her records didn't seem to be the appropriate specialists for the conditions that she presented. For example, this Dr. Koretsky, whose name I'm probably mispronouncing, was a pulmonary specialist, and then he ends up giving opinions about her nervous disorders. So maybe you could comment upon those things. Actually, Dr. Koretsky is an internist. Internists treat all kinds of adult conditions, everything from physical conditions to emotional conditions. Internists generally refer out to specialists if something goes beyond a certain level. However, internists prescribe medication for depression. They prescribe medication for anxiety. They treat pain disorders. They treat your flu. Internists are the broadest medical field. Well, yes, of course, but this was a pulmonary specialist, a pulmonologist by his own specialty. Is that correct? Oh, he's a sleep disorder specialist, actually, which is something that unfortunately gets disregarded. How does he get to be from a ñ what is the connection between a pulmonologist and a sleep disorder? Sleep disorders very often have something to do with the way a person breathes. But irrespective, those are ñ we are dealing with narcolepsy here. Narcolepsy is a sleep disorder. And we have a physician who performed an independent medical review who has experience in treating sleep disorder. Did that physician have any experience in Sogren's or Crohn's disease? I have not personally spoken to him, and Mr. Mary has not taken his deposition or propounded any discovery. So absent from the evidence that's on the record, we do not know. And the record does not show any background? It shows that he's an internist who has a host of years of experience, hence Mr. Mary's comment that he's stereotric, which I find highly offensive. Plus he has a long history of teaching. He has been involved with a lot of different institutions and facilities out east. So I would believe that autoimmune disorders have crossed his desk. How is there no physical exam? This is a person with multiple issues and problems, and you do two paper record reviews. Can you give me a further explanation why a reasoned, principled process would not expect to have this person actually examined or at least have your reviewing doctors consult with her physicians, neither of which occurred in this case? I cannot speak to the exact motivation, but what I conclude certainly is there were no discrepancies here to such degree as it felt like an individual needed to conduct a physical examination. The medical records are silent as to any objective evidence limiting Ms. Okuno. There is objective evidence diagnosing Ms. Okuno. I agree with that. That's not what we're looking for. We're looking for objective evidence establishing restrictions and limitations that would apply to her job, and her job is a sedentary job. Nobody says here that Ms. Okuno does not have medical issues. We are the last ones to say that. Nobody says here that Ms. Okuno can go out and lift heavy boxes. Nobody says she can work at a facility driving a crane. That's not what we're saying. Her doctor says that she cannot even come to work at least four days of every month. What is he basing that on? That's exactly our question. There is no evidence saying that that's the case. He says so, but that's just not enough in these types of cases, Your Honor. Case law from this court is very clear that there needs to be more. There needs to be objective evidence showing that the conditions cause symptoms which are such severe as to limit somebody from doing, in this case, at this juncture, any occupation, which means any sedentary occupation which requires frequent sitting, which requires only occasional walking, less than an hour sometimes. That's all we're saying she can do. So this is not a situation where we're saying she doesn't have any medical problems. Not at all. All we're saying is her sedentary, and I think my time is up, so I will just finish my sentence. Her sedentary condition, her sedentary position is something she can do, and that is what the evidence supports in this case. Thank you. Thank you. Thank you, Your Honor. I'll just be very brief. The first thing I want to correct is I'm not casting aspersions on Dr. Koretsky's age. He's not that much older than I am. He's a geriatric pulmonologist because he treats breathing problems in old people. His certification is geriatric pulmonology. So it doesn't matter. I guess, and that goes to the fact that another reason why he's not qualified, because Patty Okuno is only 40 or 42. Lots of discussion about objective evidence. There's no requirement in this plan for objective evidence, number one, of anything. And number two, nobody raised it in any of the letters. They didn't say you haven't given us objective evidence. Point number three is a doctor who treats narcolepsy day in and day out, year in and year out, sees a patient over a period of 18 months, he can make an objective assessment about whether she can work. And your hospital records. And the emergency records. There's tons of objective evidence here. Yes. The only other thing I'd say is, you know, if they didn't like our evidence, they could have told us what they wanted. They could have sent her for their own sleep examination. They could have sent her for a mental examination. They didn't do any of that. Reliance's decision was unreasonable. We'd ask the court to reverse the decision. Thank you. What are you asking for by way of relief? Well, that raises an interesting question, Your Honor, because as we've talked about in the briefs, and I was under the understanding that she had a two-year own-occupation stretch in here, so I was always of the belief that the issue was own-occupation. It was only when they called it to my attention in their reply brief that I looked at the plan and said, oh, own-occupation is only covered for a year. There's nothing in the briefing, or nothing in any of the letters that alerted anybody to the fact that they had changed the standard from own-occupation to any occupation. My initial request for relief was reinstate the benefits, and then it will go back for any occupation. Since there hasn't been any occupation, it's interesting because there wasn't any occupation determination in my view. The defendant says there was, so I don't know whether that constitutes a waiver of the right to a remand and the court can just order any occupation benefits reinstated or not. That's what I asked for in my initial brief. In the reply, we'd accept either one. Since this all came down, she's been determined to be disabled by Social Security and there's a whole lot of other stuff, so I don't have any doubt that if we go back on a remand, we'll be able to establish that she's any occupation disabled. That's not a concern of mine. Thank you. All right, thank you. Case is submitted. And once the table is clear, you may call the next case.